IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FURSYTH PETROLEUM FOUNDATION, INC. * <br> 15619 Elsmere Court * <br> Bowie, Maryland  20716 * <br> Prince George's County * <br>  * <br> and * <br>  * <br> BASHIRU HAMZAT * <br> 15619 Elsmere Court * <br> Bowie, Maryland  20716 * <br> Prince George's County * <br>  * <br> Plaintiffs * <br>  * <br> v. * <br>  * <br> PMIG 1025, LLC * <br> Suite 700 * <br> 7600 Wisconsin Avenue * <br> Bethesda, Maryland  20814 * <br> Montgomery County * <br>  * <br>    SERVE: RESIDENT AGENT * <br>    Stuart A. Schwager, Esq. * <br>    7600 Wisconsin Avenue * <br>    Bethesda, Maryland  20814 * <br>  * <br> and * <br>  * <br> PETROLEUM MARKETING GROUP, INC. * <br> Suite 700 * <br> 7600 Wisconsin Avenue * <br> Bethesda, Maryland   20814 * <br> Montgomery County * <br>  * <br>    SERVE: RESIDENT AGENT * <br>    Stuart A. Schwager, Esq. * <br>    7600 Wisconsin Avenue * <br>    Bethesda, Maryland  20814 * <br>  * <br>    Defendants * | <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> <br> C.A. No. _____ <br> <br> **JURY DEMAND** |

# **COMPLAINT**

Plaintiffs, Fursyth Petroleum Foundation, Inc. ("Fursyth") and Bashiru Hamzat ("Hamzat")(Fursyth and Hamzat collectively referred to herein as "Plaintiffs"), sue the defendants, PMIG 1025, LLC ("PMIG 1025") and Petroleum Marketing Group, Inc. ("PMG")(PMIG 1025 and PMG collectively referred to herein as "Defendants"), and state:

## Jurisdiction and Venue

l. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 by virtue of Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801-2806. Pendent subject matter jurisdiction exists over the state law claims.

2. Venue in this District is proper pursuant to 28 U.S.C. § 1391(a) and l5 U.S.C. § 2805(a).

## The Parties

3. Plaintiff Fursyth is a Maryland corporation engaged in the retail motor fuel and convenience store business at 1001 Aviation Boulevard, Baltimore, Anne Arundel County, Maryland 21240 (the "Leased Marketing Premises" or the "Site") under the trade name of "Airport Shell." Plaintiff Hamzat is a stockholder, officer (President) and employee of Fursyth.

4. Defendant PMG is a Maryland corporation engaged in the distribution of motor fuel and other petroleum products. Upon information and belief, PMG is a closely held corporation, the stock of which is owned, in whole or in part, by Hossein Ejtemai ("Ejtemai"), who is also PMG's president and a member of its Board of Directors. PMG purchases motor fuel and resells it. Upon information and belief, PMG is authorized by several petroleum refiners, including Motiva Enterprises, to market their branded petroleum products. Specifically, PMG is

authorized to distribute "Shell" branded motor fuel and products, and to use the "Shell" trademark in connection with such activities, throughout the Washington, D.C. metropolitan area, including Anne Arundel County, Maryland.

5.  Defendant PMIG 1025 is a Maryland limited liability company. In or around 2004, defendant PMIG 1025 was assigned the primary lease for the Leased Marketing Premises. Upon information and belief, the membership interests in PMIG 1025 are owned in whole or in part by Ejtemai, and PMIG 1025 is an affiliate of PMG. Also upon information and belief, PMIG 1025 was formed by Ejtemai for the purpose of owning or leasing real property, including the Leased Marketing Premises, for the benefit of PMG's petroleum distribution business.

## **FACTS**

6.  The State of Maryland owns and operates, through the Maryland Department of Transportation Maryland Aviation Administration ("MAA") Baltimore/Washington International Airport ("BWI Airport"). The Leased Marketing Premises is located on the property of BWI Airport.

7.  In or around 1997, in response to Invitation for Bids No. MAA-IFB-96-001, MAA awarded a contract to Crown Central Petroleum Corporation ("Crown") to design, construct and operate a public automotive gasoline station, car wash, convenience store and Air Cargo Complex food facility at the Leased Marketing Premises. The contract was dated July 24, 1997, and was identified as Contract No. MAA-LC-97-004 (the "1997 Contract"). The term of the 1997 Contract was for twenty (20) years after the termination of the construction period as defined in the 1997 Contract.

8.  The 1997 Contract incorporated the policy of MAA of Minority Business

Enterprise (MBE) participation, and provided that MBE's "shall have the maximum opportunity to share in the benefits from the Airport Concession opportunities." 1997 Contract at Article 21. Accordingly, the 1997 Contract required that Crown enter into a subcontract with an MDOT certified Airport Concession Disadvantaged Business Enterprise ("ACDBE") to operate the facility at the Leased Marketing Premises. 1997 Contract at Article 22. One of the goals of the ACDBE program is to "create a level playing field on which ACDBE's can compete fairly for opportunities for concessions." 49 C.F.R. Section 23.1(b).

9. In 2004, Crown assigned its interest in the 1997 Contract to PMIG 1025, with the consent of MAA.

10. In 2009, Fursyth, a certified ACDBE, acquired the business of the ACDBE operating the facility at the Leased Marketing Premises at that time. Fursyth paid $675,000.00 to acquire the business, and since 2009, has invested an additional approximately $200,000.00 to purchase equipment for the business (to include the purchase of car wash equipment and air/vacuum machines).

11. As part of the acquisition of the business at the Leased Marketing Premises, Fursyth signed a Branded Service Station Sublease and Dealer Agreement with Defendants dated February 19, 2009 (the "Franchise Agreement"). The Franchise Agreement was for an initial term of three (3) years, from February 19, 2009 to February 18, 2012, and, among other things, authorized Fursyth to use the "Shell" trademark in connection with the sale of Shell motor fuel from the Site.

12. Although the initial term of the Franchise Agreement was for three (3) years, the parties executed a renewal of the Franchise Agreement approximately every five years, with the

most recent renewal occurring on August 21, 2019.

13. Under Section 5.01 of the 1997 Contract, PMIG 1025 is to pay to MAA the greater of (1) a minimum annual guarantee (which started at $25,000 in 1997) and was subject to adjustment on an annual basis, or (2) operating fee payments consisting of two separate items: (i) five percent (5%) of annual gross revenues derived from the sale of gasoline and fuel/oil products, and (ii) seven and one half percent (7.5%) of annual gross revenues derived from the sale of items other than gasoline and fuel/oil products.

14. After it acquired the business, and based upon instructions that it receives from PMIG 1025, Fursyth provides the sales data that is used by PMIG 1025 to calculate the "operating fee" (referred to herein as "percentage rent") payments to be made by PMIG 1025 to MAA each month.

15. Although the initial Franchise Agreement provided that Fursyth was to pay rent to Defendants in the amount of $28,077 per month, in the first several years of the parties' business relationship, Defendants discounted the rent paid by Fursyth to more closely align with the percentage rent that PMIG 1025 was paying to MAA.

16. In or around April of 2014, when Fursyth's Franchise Agreement was up for renewal, Defendants advised Fursyth that its rent would have to be raised to a level that was higher than the percentage rent being paid by PMIG 1025 to MAA. Beginning in August of 2014 and for each month thereafter, the rent paid by Fursyth to Defendants under the Franchise Agreement always exceeded the percentage rent paid by PMIG 1025 to MAA under the 1997 Contract.

17. In 2019, the term of the 1997 Contract had expired, and MAA was soliciting bids

for a new contract to operate the Site.  In March of 2019, when Fursyth's Franchise Agreement was also up for renewal, a meeting occurred at the Site between Plaintiff Hamzat and representatives of Defendants, including Ejtemai.  During the meeting, Ejtemai sought to convince Plaintiff Hamzat to allow Defendants to take over the control of the facility at the Site under the new contract with MAA.  When Plaintiff Hamzat did not agree to Ejtemai's proposal and requested that he remain the dealer at the Site under the new contract with MAA, Ejtemai and the other representatives of Defendants made it clear that Defendants would "do everything within their legal power" to have Plaintiffs removed from the Site.  At the conclusion of the meeting, a representative of Defendants advised Plaintiff Hamzat that the rent would be increased in the renewed Franchise Agreement.

18. After the meeting referenced in paragraph 17 above, Defendants presented Fursyth with a renewal of the Franchise Agreement pursuant to a Dealer Lease and Supply Agreement dated August 21, 2019 (the "2019 DLSA"), which included a rent increase effective September 2019 from $37,447.20 per month to $49,500.00 per month—an increase of over $12,000 per month.  When Plaintiff Hamzat asked why the rent increase was so high, he was told by a representative of Defendants that PMIG 1025's underlying rent to MAA was also being increased, and that Defendants were passing along the increase to Fursyth.  At the time, Plaintiff Hamzat believed that statement, and he signed the 2019 DLSA on behalf of Fursyth.  However, the statement was actually false.  In August of 2019, PMIG 1025 paid monthly percentage rent to MAA in the approximate amount of $27,996.91.  In September of 2019, PMIG 1025's percentage rent was $24,838.14—approximately $25,000 less than what it charged Fursyth for the same month.

19. The term of the 2019 DLSA is for three years, beginning on September 1, 2019, and ending on August 31, 2022, subject to the underlying lease with MAA.

20. Upon information and belief, since March of 2009, Defendants have recognized profit of over $1 million based upon the difference between the rent Defendants charge to Fursyth and the percentage rent that PMIG 1025 pays to MAA.

21. Defendants are the exclusive supplier of motor fuel to Fursyth under the Franchise Agreement. Under the Franchise Agreement, Defendants are charging Fursyth a "dealer tankwagon" ("DTW") price for motor fuel. Upon information and belief, PMG receives margins on the wholesale of motor fuel to Fursyth of at least thirty (30) to forty (40) cents per gallon, based upon the "rack" price posted by the Oil Pricing Information Service. At the same time, Fursyth's margins on the retail sale of motor fuel are in the range of fifteen (15) to twenty (20) cents per gallon, in order to allow Fursyth to pay the high monthly rents charged by Defendants under the Franchise Agreement. Fursyth's ability to sell its motor fuel is also severely restricted due to the fact that Defendants are charging Fursyth a DTW price for motor fuel that is approximately twenty (20) cents per gallon higher than the retail or "street" price charged by other gas stations in the area of the Leased Marketing Premises.

22. After the term of the 1997 Contract expired, MAA issued Request for Proposals No. MAA-RFP-19-001 ("RFP"), for the "redevelopment, operation/management, and maintenance" of the Leased Marketing Premises, which was identified as "Site 2" in the RFP. The RFP also provided for the "design, development, financing, construction, management, operation and maintenance" of a separate gas station and convenience store on another site located on the property of BWI Airport and identified in the RFP as "Site 1."

7

23. PMG Airport Plaza Developers, LLC ("PMGAPD") submitted a bid (the "PMGAPD Proposal") in response to the RFP, which was accepted by MAA. As a result, PMGAPD was awarded Lease and Concession Contract MAA-LC-20-018 (the "2018 Contract"). The effective date of the 2018 Contract is January 29, 2020. The 2018 Contract requires that PMGAPD meet all specifications described in the PMGAPD Proposal. The 2018 Contract also provides that PMGAPD is to pay the greater of a minimum monthly guaranty of $7,500.00 per month, or 5.75 percent of monthly gross revenues.

24. Upon information and belief, PMGAPD is an affiliate of and under common ownership with PMG and PMIG 1025. The "Proposed Operating Organizational Chart" submitted with the PMGAPD Proposal shows PMG directly above PMGAPD in the organizational "chain," and the PMGAPD Proposal further provides that PMGAPD "is 100% owned by Mr. Hossein Ejtemai the principle owner and holder of the controlling interest in Petroleum Marketing Group, Inc. . . . ."

25. The PMGAPD Proposal provides in pertinent part that the Leased Marketing Premises was to be converted to a 7-Eleven convenience store, to be operated by PMGAPD as a "commissioned agent." Thus, Defendants plan to convert the Leased Marketing Premises to operation by an agent of Defendants.

26. Despite the fact that the effective date of the 2018 Contract was January 29, 2020, Defendants did not terminate the Franchise Agreement, and Fursyth continued to operate the business at the Leased Marketing Premises, and continued paying rent to Defendants in accordance with the 2019 DLSA. In April of 2020, the rent paid by Fursyth to Defendants exceeded the percentage rent paid by PMIG 1025 to MAA by over $44,000.00. While PMIG

8

1025 was enjoying a substantial reduction in its percentage rent paid to MAA during the Covid pandemic crisis, it was passing along just a fraction of that reduction to Fursyth in the form of its rental assistance program. For example, in October of 2020 Fursyth's rent amount was $51,480.00, and Defendants provided rental assistance in the amount of $7,500.00, resulting in a net rent paid to Defendants in the amount of $43,980.00. For that same month, PMIG 1025 paid percentage rent to MAA in the approximate amount of $14,233.39, resulting in a profit to Defendants on the monthly rent of approximately $29,746.61.

27. By letter dated November 16, 2020, Defendants notified Plaintiffs that the Franchise Agreement would be terminated effective January 15, 2021, based upon the expiration of the underlying lease with MAA. Despite the fact that Defendants knew that they were going to continue to lease the Site through their affiliate PMGAPD under the 2018 Contract with MAA, the letter states that "PMG hereby informs you that it does not possess a contractual right to extend the underlying lease past **January 15, 2021**." The letter also provided Plaintiffs with the "contact information for the property owner for [Fursyth's] use in the event [Fursyth] wish[es] to attempt to enter into negotiations with the property owner to directly lease the property." The letter also notified Plaintiffs of their right to request that Defendants "make a bona fide offer to sell, transfer, or assign its interest in certain improvements or equipment located on the premises."

28. After the letter referenced in Paragraph No. 27 above was sent, Defendants' representatives scheduled a meeting with Plaintiff Hamzat at the Site. Defendants' then cancelled the meeting, but a representative of Defendants followed up with a telephone call to Plaintiff Hamzat. During that telephone call, Defendants' representative advised that

Defendants' wanted to "help" Plaintiffs recover some of their investments by purchasing Plaintiffs' equipment and convenience store inventory. Plaintiff Hamzat responded that he understood that MAA had awarded a new contract to Defendants and that Plaintiffs wanted to continue as dealer at the Site under the new contract. Defendants' representative responded that Defendants do not intend to move forward with a new contract with MAA, and that MAA had awarded the contract to another company that would operate the Site directly and not through a sublease with a dealer.

29. After the telephone conversation referenced in paragraph 27 above, and in response to Defendants' letter of November 16, 2020, Fursyth, through undersigned counsel, provided notice to Defendants pursuant to PMPA Section 2802(c)(4)(C) that Fursyth was requesting that Defendants make a bona fide offer to sell Defendants' interest in its improvements and equipment at the Leased Marketing Premises to Fursyth. In response, by letter dated January 6, 2021, Defendants rescinded the notice of termination, and stated that "PMG's franchise relationship and all related agreements with [Fursyth] remain in full force and effect." Accordingly, the parties continued to operate under the Franchise Agreement as renewed in the 2019 DLSA.

30. By letter dated January 22, 2021, MAA notified Fursyth that MAA had awarded a new contract for this site to PMG Airport Plaza Developers LLC to replace the 1997 Contract, and that MAA was terminating Fursyth's dealer agreement (MAA-MA-09-013) effective February 19, 2021. However, PMG and PMIG 1025 did not terminate the Franchise Agreement, and Fursyth continued to operate the business at the Leased Marketing Premises after February 19, 2021.

31. Despite the fact that the PMGAPD Proposal provides for PMGAPD to operate the proposed 7-Eleven gas station at the Leased Marketing Premises as a commissioned agent, in April of 2021, in an apparent effort to feign compliance with the PMPA, Defendants (through counsel) submitted a proposed new Dealer Lease and Supply Agreement to Fursyth for the operation of a 7-Eleven franchise at the site, at a proposed rent of **$59,800.00 per month** (the "2021 DLSA").  Through undersigned counsel, Fursyth inquired of counsel for Defendants whether the proposed rent in the 2021 DLSA was negotiable, and counsel for Defendants responded that it was not.  Undersigned counsel then advised counsel for Defendants that Fursyth could not sign the 2021 DLSA because the proposed rent of $59,800.00 per month would make it impossible to earn a profit at the Site.

32. By letter dated August 19, 2021 (the "Nonrenewal Notice"), Defendants, through counsel, notified Plaintiffs that the Franchise Agreement, as renewed in the 2019 DLSA, will be nonrenewed, effective November 22, 2021.  The grounds for the nonrenewal stated in the Nonrenewal Notice are based on Section 2802(b)(3) of the PMPA.  That section authorizes nonrenewal of the franchise relationship based upon

> [t]he failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—
> (i)  such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
> (ii)  such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship.

15 U.S.C. §2802(b)(3).

33. The Nonrenewal Notice states that "[t]he existing franchise between PMG and

Fursyth expires on the earlier to occur of August 31, 2022 or a date that is thirty (30) days prior to the date the underlying lease between PMG and [MAA] terminates. . . . The underlying lease terminated on February 19, 2021." However, as noted above, Defendants still have control of the Leased Marketing Premises through their affiliate, PMGAPD, and Defendants did *not* rely on the expiration of the underlying lease to justify the non-renewal of the Franchise Agreement under Section 2802(c)(4) of the PMPA. The Nonrenewal Notice also references the fact that on April 19, 2021, counsel for Defendants sent the 2021 DLSA to undersigned counsel for Fursyth's "acceptance and approval," and that

> [t]he term of the new franchise is ten (10) years, and it contains changes or additions to the existing franchise, including new monthly rents. The new franchise is designed to replace the existing franchise on its expiration date and to create a new franchise relationship between the parties. . . . [Counsel for Defendants] was advised by [counsel for Plaintiffs] that the new franchise is unacceptable to you, primarily because you believe the rent is too high.
>
> Your failure to agree to the new rent and other changes or additions to the franchise constitute grounds for nonrenewal of the franchise relationship under the above-stated provisions of the PMPA.

34. Other than Section 2802(b)(3) of the PMPA, there were no other grounds for the nonrenewal stated in the Nonrenewal Notice.

## COUNT 1
**(Violation of the Petroleum Marketing Practices Act)**

35. The allegations of paragraphs 1 - 34 are incorporated by reference.

36. The entire contractual relationship between Plaintiffs and Defendants, including, but not limited to, the 2019 DLSA and related documents, constitutes a petroleum marketing "franchise" and "franchise relationship", the termination or nonrenewal of which is governed by

12

Title I of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. 2801 - 2806.

37. Under §2801(6) of the PMPA, defendant PMG is a "distributor," in that PMG "purchases motor fuel for ...distribution to another." Defendant PMIG 1025 is a "distributor" because it is an "affiliate" of PMG within the meaning of §2801(6) and §2801(15). Defendant PMG and its affiliate, defendant PMG 1025, are "franchisors" under §2801(3) in that they authorize a retailer or distributor "under a franchise, to use a trademark in connection with the sale ... or distribution of motor fuel."

38. Plaintiffs are "retailers" and/or "distributors" under §§2801(6) and (7) of the PMPA, and are additionally "franchisees" within the meaning of §2801(4). For purposes of the relationship with PMG and PMIG 1025, Fursyth and Hamzat are "affiliates" within the meaning of §2801(15).

39. Under §2802 of the PMPA, the termination of any franchise or the nonrenewal of any franchise relationship is prohibited unless a franchisor complies with the notice requirements of §2804 of the Act, and the termination or nonrenewal "is based upon" a permitted ground.

40. Defendants' purported nonrenewal of the franchise relationship is unlawful, in willful violation of the PMPA, in that:

    A. No permitted ground in fact exists and the purported nonrenewal is not based upon a permitted ground but is, instead, pretextual;

    B. To the extent that Defendants rely upon §2802(b)(3)(A)(i) and (i):

        (i) the determinations made by Defendants were not in good faith and in the normal course of business; and

        (ii) Defendants' insistence upon the changes or additions to the franchise

are for the purpose of converting the Leased Marketing Premises to operation by employees or agents of Defendants for the benefit of Defendants or otherwise preventing the renewal of the franchise relationship; and

      C.      Defendants unlawfully non-renewed the Franchise Agreement with an effective date of November 22, 2021, prior to the August 31, 2022 expiration date of the 2019 DLSA.

**WHEREFORE**, Plaintiffs request the following relief:

      A.      A declaratory judgment declaring:

      (i) that the relationship between the parties, including the 2019 DLSA, is a petroleum franchise relationship to which the PMPA applies;

      (ii) that the attempted nonrenewal of the franchise relationship is unlawful, in violation of the PMPA; and

      (iii) that the franchise relationship, including the Lease of the Leased Marketing Premises, is extended for a term of not less than three (3) years from September 1, 2019.

      B.      That the Court issue preliminary and permanent injunctions prohibiting the termination or nonrenewal of the franchise relationship, including the 2019 DLSA, and that any changes or additions to the franchise agreement in connection with any future renewals be in accordance with the good faith and normal course of business standard in the PMPA.

      C.      That the Court award Plaintiffs their reasonable attorneys' and expert witness fees and costs.

      D.      That the Court award such damages, including punitive damages for Defendants' willful violation of the PMPA, which the Court deems appropriate.

E.       That the Court grant such additional relief as the nature of the case may require.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

_____/s/_____
JAMES L. PARSONS, JR.    #7518
Lynott, Lynott & Parsons, P.A.
11 North Washington Street, Suite 220
Rockville, Maryland  20850
(301) 424-5100
jparsons@llplawfirm.com
Counsel for Plaintiffs

15