**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| **FURSYTH PETROLEUM** | * |
| **FOUNDATION INC.,** *et al.***,** | |
| | * |
| **Plaintiffs,** | |
| | * |
| **v.** | **Case No.: PWG 21-cv-2433** |
| | * |
| **PMIG 1025, LLC,** *et al.***,** | |
| | * |
| **Defendants.** | |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION AND ORDER**

This Petroleum Marketing Practices Act ("PMPA") case was filed on September 23, 2021 by Fursyth Petroleum Foundation, Inc. ("Fursyth") and its owner, officer (President), and employee, Bashiru Hamzat, who operate a retail motor fuel and convenience store ("Service Center") located adjacent to Baltimore Washington International Airport ("BWI"), under the trade name of "Airport Shell." Compl., ECF No. 1. Plaintiffs sued PMIG 1025, LLC ("PMIG 1025") and Petroleum Marketing Group, Inc. ("PMG"), alleging an improper termination of the Franchise Agreement under which Forsyth operates the Service Center , which is a violation of the PMPA, 15 U.S.C. § 2801 *et seq. Id.* Currently pending before me is Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, as supplemented, ECF Nos. 22, 35, by which Plaintiffs seek to enjoin the nonrenewal of the petroleum franchise relationship between the parties. I have reviewed the filings[1] and held an evidentiary hearing. Because Plaintiffs have made a sufficient showing of a reasonable chance of prevailing on the merits, and I have found that the potential harm to the

---

[1]     Mot., ECF No. 3; Suppl. Mot., ECF No. 22; Resp., ECF No. 23; Reply, ECF No. 24; Joint Stip. Facts, ECF No. 29; Pls.' Post-Hr'g Br., ECF No. 35; Defs.' Post-Hr'g Br., ECF No. 36; and all the attached exhibits.

Plaintiffs without an injunction issuing is greater than the potential harm to the Defendants with such an injunction, I shall GRANT Plaintiffs' motion.

## BACKGROUND

### I.     Overview of PMPA

The Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*, protects franchisees by limiting the circumstances under which a petroleum franchisor may terminate or "fail to renew" a motor fuel franchise. *Mac's Shell Serv., Inc. v. Shell Oil Prods. Co. LLC*, 559 U.S. 175, 177 (2010) (citing 15 U.S.C. § 2802). To invoke the protections of the PMPA, franchisees must first prove that their franchise was terminated or nonrenewed. *Korangy v. Mobil Oil Corp.*, 84 F. Supp. 2d 660, 664 (D. Md. 2000) (citations omitted).  A franchisee may sue a franchisor that does not comply with the PMPA's restrictions on terminations and nonrenewals, and if successful, can receive compensatory and punitive damages, reasonable attorney's fees and expert costs, and equitable relief. *Mac's*, 559 U.S. at 179 (citing 15 U.S.C. § 2805).  Courts may also grant preliminary relief "if there are 'sufficiently serious questions going to the merits' that present 'a fair ground for litigation' and the balance of hardships favors such relief. *Id.* (quoting 15 U.S.C. § 2805(b)(2)).  The precondition and grounds for termination or nonrenewal are contained in 15 U.S.C. § 2802(b) and include the failure of a franchisor and franchisee to agree to changes or additions to the franchise agreement.

## II.    Factual Background[2]

### A.    The Underlying Lease

The Baltimore Washington International ("BWI") airport is owned by the State of Maryland, through the Maryland Department of Transportation ("MDOT") Maryland Aviation Administration ("MAA").  In 1997, Crown Central Petroleum Corporation was awarded a contract ("1997 Contract") to design, construct, and operate a public automotive gasoline station, car wash, convenience store and Air Cargo Complex food facility located at the BWI airport (referred to by the parties as the "Leased Marketing Premises" or "Site 2"). The 1997 Contract was for a period of 20 years after the termination of the construction period defined in the 1997 Contract.  Crown subcontracted with an MDOT-certified Airport Concession Disadvantaged Business Enterprise ("ACDBE") to operate the facility.[3]

In 2004, Crown assigned its interest in the 1997 Contract to Defendant PMIG 1025, LLC[4] with the consent of MDOT MAA.  Thereafter, PMIG 1025 leased Site 2 located on the BWI airport property and took over the subcontract relationship with the ACDBE that operated the facility. Under the 1997 Contract, PMIG 1025 paid MAA the greater of (1) a minimum annual guarantee subject to annual adjustment ($25,000 in 1997), or (2) operating fee payments consisting of (i) 5% of annual gross revenues derived from the sale of gas and fuel/oil products, and (ii) 7.5% of annual gross revenues derived from the sale of items other than gas and fuel/oil products.  The ACDBE

---

[2]    This summary is based primarily on the Complaint and the parties' Joint Stipulation of Facts, ECF No. 29.  It is supplemented by testimony from the evidentiary hearing held on March 8-9, 2022.  Paper copies of the transcripts from the hearing were provided to the Court by the parties in a joint submission on April 12, 2022.

[3]    The policy of MAA of Minority Business Enterprise participation was incorporated into the 1997 Contract, which provided that Minority Business Enterprises "shall have the maximum opportunity to share in the benefits from the Airport Concession opportunities."  1997 Contract at Article 21; Article 22.

[4]    PMIG 1025 is a Maryland limited liability company.  The membership interests are owned in whole or in part by Abdolhossein Ejtemai.

operating the facility provides the sales data used by PMIG 1025 to calculate the "operating fee" payments, also referred to as "percentage rent" payments that PMIG 1025 pays to MAA each month.

In 2019, the 1997 Contract expired, and MAA solicited bids for a new contract to operate Site 2.[5] After expiration, the underlying lease was described as "month-to-month."  As part of MAA's bid process, it held a Pre-Proposal Conference, at which time, MAA stated that it would not consider awarding contracts to two separate entities for the development of the two sites (the current site, known as Site 2, and the new site, known as Site 1).  PMG BWI Airport Plaza Developers, LLC ("PMG BWI")—under common ownership with PMIG 1025— submitted a bid in response to the RFP.  PMG BWI's proposal provided for Site 2 to be converted to a 7-Eleven convenience store, to be operated by PMG BWI as a "commissioned agent" to Apex Petroleum,[6] a certified-ACDBE.  The bid was accepted, and PMG BWI was awarded Lease and Concession Contract MAA-LC-20-018 (the "20-018 Contract"), effective January 29, 2020.  Under the 20-018 Contract, PMG BWI is to pay the greater of a minimum monthly guaranty of $7,500 per month, or 5.75% of monthly gross revenues.  A pro-forma financial operating statement submitted with the bid shows net income before payment of rent for the business at Site 2 at $600,803 for the first year.  PMG BWI subleased Site 1 to Sheetz in August 2021.[7]

---

[5]     MAA issued Request for Proposal No. MAA-RFP-19-001, for the "redevelopment, operation, management, and maintenance" of the Leased Marketing Premises, which was identified as "Site 2" in the RFP.  The RFP also provided for the "design, development, financing, construction, management, operation and maintenance" of a new and separate gas station and convenience store on another site located on the BWI airport property and identified as "Site 1."

[6]     I note that PMG sells fuel to Apex.

[7]     The sublease for Site 1 included Sheetz assuming all of PMG BWI's obligations under the 20-018 Contract to design, develop, finance and construct the service station, which the bid had estimated would cost about $6.898 million.  The rent for Site 1 after occupancy starts at $41,666.67 with 5% increases every 5th year to $50,646.09 in the 24th year of the sublease.  In connection with Sheetz becoming a sublessee as to Site 1, the MDOT MAA also agreed to eliminate the ACBDE requirement for Site 1 while keeping it in place for Site 2.

**B.     The Franchise Agreements[8]**

In 2009, Fursyth, a certified ACDBE, acquired the business that had been operating the facility at the BWI airport Site 2 and signed a Franchise Agreement with PMIG 1025 for an initial term of three years, from February 19, 2009, until February 18, 2012.  Fursyth continued to renew the Franchise Agreement and has been operating the facility continuously under the trade name of "Airport Shell."  Defendant, Petroleum Marking Group, Inc. ("PMG"), distributes motor fuel and other petroleum products, including Shell-branded products, which it purchases and resells.[9]  PMG supplies Fursyth with Shell products under the Franchise Agreement, and Defendants are the exclusive supplier of motor fuel to Fursyth, charging Fursyth a "dealer tankwagon" ("DTW") price for the fuel.  The most recent renewal of the Franchise Agreement was on August 21, 2019.

Under the initial Franchise Agreement, Fursyth was to pay rent to Defendants in the amount of $28,077 per month, but in the first several years, Defendants discounted the rent. When the Franchise Agreement was renewed in April 2014, Defendants raised Fursyth's rent to a level that was higher than the percentage rent that PMIG 1025 paid to MAA.  Since that time, Fursyth's rent to Defendants under the Franchise Agreement has exceeded the percentage rent paid by PMIG 1025 to MAA under the 1997 Contract. On July 1, 2016, Fursyth, PMG, and PMIG 1025 entered into a new Dealer Lease and Supply Agreement for the term July 1, 2016 through June 30, 2019 (the "2016 DLSA"), which provided for rent of $33,842.64 for the first year, $35,196.35 for the second year, and $36,604.20 for the third year.

In March 2019, Fursyth's Franchise Agreement was up for renewal.  Around this time, Mr. Hamzat (Fursyth's owner) met with representatives of Defendants, including Mr. Ejtemai

---

[8]      Four agreements were provided to the Court, Joint Exs. 3, 12, 15, 16.
[9]      PMG is a closely held corporation owned by Mr. Ejtemai, who is also President and a member of its Board of Directors.  PMIG 1025, PMG, and PMG-BWI are affiliates.

(Defendants' owner). Although the communications that occurred during the meeting are disputed, at the conclusion of the meeting, Brandon Riley, Defendants' Regional Manager for Maryland, advised Mr. Hamzat that the rent would be significantly increased in the renewed Franchise Agreement to $59,500 per month and that upper management wanted to go even higher.  After the meeting, Defendants provided Fursyth with a renewal Franchise Agreement under a Dealer Lease and Supply Agreement dated August 21, 2019 (the "2019 DLSA").  The new agreement was not backdated to July when the prior agreement had expired, and the rent increase became effective on September 1, 2019.

The 2019 DLSA term was three years beginning September 1, 2019 to August 31, 2022, and it was specifically subject to the underlying "month-to-month" lease with MAA.  Mr. Hamzat signed the 2019 DLSA, which included rent effective September 2019 of $49,500 per month, which represented an increase of over $12,000 per month over the prior agreement.  At that time, i.e., August 2019, PMIG 1025 only paid monthly percentage rent to MAA of $27,996.91, and in September 2019, PMIG 1025 paid $24,838.14, which is about $25,000 less than what it charged Fursyth that month. The rental increase was explained as being due to a combination of factors, including improvements that MAA required to be made at the site. Mr. Hamzat testified that Mr. Riley told him that he was lucky to be getting a new lease because Mr. Ejtemai was looking for all legal means to get him out of the facility. Nevertheless, Fursyth continued to operate the business at Site 2 and paid rent to Defendants in accordance with the 2019 DLSA.

By letter dated November 16, 2020, Defendants notified Fursyth that the Franchise Agreement would be terminated effective January 15, 2021, based upon the expiration of the underlying lease with MAA, although the 1997 Contract had expired in 2019, and the 20-018 Contract became effective on January 29, 2020.  The letter states that "PMG hereby informs you

that it does not possess a contractual right to extend the underlying lease past January 15, 2021."

The letter also notified Plaintiffs of their right to request that Defendants "make a *bona fide* offer

to sell, transfer, or assign its interest in certain improvements or equipment located on the

premises."  Defendants then scheduled a meeting with Mr. Hamzat at Site 2, but the meeting was

cancelled, and a representative of Defendants followed up with a telephone call, the substance of

which is disputed.

After the letter and telephone call, Fursyth, through counsel, provided notice to Defendants

under PMPA § 2802(c)(4)(C) that Fursyth was requesting Defendants to make a *bona fide* offer to

sell Defendants' interest in its improvements and equipment at the Leased Marketing Premises to

Fursyth.  But, by January 6, 2021, Defendants had rescinded the notice of termination, stating that

"PMG's franchise relationship and all related agreements with [Fursyth] remain in full force and

effect."  The parties continued to operate under the Franchise Agreement as renewed in the 2019

DLSA.

By letter dated January 22, 2021, MAA notified Fursyth that MAA had awarded a new

contract for Site 2 to PMG BWI to replace the 1997 Contract, and that Fursyth's dealer agreement

would be terminated effective February 19, 2021.  But PMG and PMIG 1025 did not terminate the

Franchise Agreement, and Fursyth continued to operate the business at Site 2 after February 19,

2021.

On January 26, 2021, Defendants inquired whether Plaintiffs would be interested in

becoming a 7-Eleven franchisee, and Mr. Hamzat responded that he was interested in Fursyth

becoming a 7-Eleven franchisee.  On April 19, 2021, Defendants submitted to Fursyth a proposed

new Dealer Lease and Supply Agreement ("Proposed 2021 DLSA") for the operation of a 7-Eleven

franchise at Site 2 for ten years, at a proposed rent of $59,800 per month, with annual 4% increases,

and requiring Plaintiffs to invest over $400,000 to convert Site 2 to a 7-Eleven. After the tenth year, monthly rent would be $85,114 based on the annual increases at 4%. Fursyth asked whether the rent in the Proposed 2021 DLSA was negotiable, and the response was that the rent was non-negotiable. Fursyth's counsel then advised Defendants that Fursyth could not sign the Proposed 2021 DLSA because the proposed rent would make it impossible to earn a profit at Site 2.

On August 19, 2021, Defendants' counsel sent a letter (the "Nonrenewal Notice") notifying Plaintiffs that the Franchise Agreement, as renewed in the 2019 DLSA would not be renewed, effective November 22, 2021. The grounds given for nonrenewal are based on PMPA § 2802(b)(3), which authorizes nonrenewal based on the failure of the parties to agree to changes or additions to the provisions of the franchise. The Nonrenewal Notice states that "[t]he existing franchise between PMG and Fursyth expires on the earlier to occur of August 31, 2022 or a date that is thirty (30) days prior to the date the underlying lease between PMG and [MAA] terminates. . . . The underlying lease terminated on February 19, 2021." It also references that the Proposed 2021 DLSA was sent to Fursyth on April 19, 2021, for "acceptance and approval," that the term was 10 years and included changes to the existing franchise including new rents, that Fursyth had communicated that the new franchise was unacceptable because the rent was too high, and the failure to agree to the new rent and other changes constitutes grounds for nonrenewal.

Plaintiffs then filed suit and the pending motion for a preliminary injunction to prevent the nonrenewal from taking effect on November 22, 2021. The nonrenewal of Plaintiffs' franchise was stayed by agreement of the parties until the Court's ruling on the preliminary injunction. *See* ECF No. 21.

## STANDARD OF REVIEW

"The franchisee's burden of proof for receiving a preliminary injunction under the PMPA is not a heavy one." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir. 1984).  15 U.S.C. § 2805 contains the standard for granting a preliminary injunction in a PMPA case:

> (2) Except as provided in paragraph (3), in any action under subsection (a), the court shall grant a preliminary injunction if--
>
> (A) the franchisee shows--
>
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed, and
>
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
>
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.
>
> (3) Nothing in this subsection prevents any court from requiring the franchisee in any action under subsection (a) to post a bond, in an amount established by the court, prior to the issuance or continuation of any equitable relief.

In sum, the showing required for an injunction under the PMPA is significantly less demanding than that required to prevail in an injunction sought pursuant to  Fed. R. Civ. P. 65, inasmuch as no showing of irreparable harm is required, nor does the franchisee have to show a probability of success on the merits.  *Mobil Oil Corp. v. Vachon*, 580 F. Supp. 153, 156 (D. Mass. 1983) (citations omitted).  Rather, the franchisee must show some reasonable chance of success on the merits by presenting a case that "raises sufficiently serious questions going to the merits of the case."  *Id.*  And courts must also consider the balance of the hardships, i.e., if there is less

hardship imposed on the franchisor than the franchisee by granting the injunction, "[i]t is a point in the franchisee's favor." *Id.*

## DISCUSSION

To obtain a preliminary injunction under the PMPA, Plaintiffs must first show that the franchise has been terminated, there exist sufficiently serious questions going to merits to make such questions fair ground for litigation, and on balance, hardship that Plaintiffs (as franchisee) will suffer if relief is not granted outweighs the hardship that Defendants (as franchisor) will suffer if an injunction is granted.   15 U.S.C. § 2805 (b)(2).  I shall address each in turn.

**I.      Termination of the Franchise**

There is no dispute that Plaintiffs received written notice of nonrenewal of the franchise, and it was not less than 90 days prior to the effective date of the nonrenewal.  Therefore, Plaintiffs have satisfied this showing.

**II.     Serious Questions Going to Merits**

A franchisor may terminate or nonrenew a franchise only if its action is based on a permitted ground. *Bridges Enters. v. Exxon Co. U.S.A.*, 820 F.3d 123, 124 (5th Cir. 1987).  And the franchisor must show that not only was there a legitimate reason for the termination or nonrenewal, but that the stated reason was the actual ground for the decision. *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1469 (9th Cir. 1993).  "'Good faith' has been uniformly interpreted as meaning subjective good faith, that is, an honest evaluation of the franchisor's own business needs, and in applying that standard courts are not entitled to second-guess franchisor's economic decisions." *Vasco v. Mobil Oil Corp.*, 698 F. Supp. 102, 104 (D. Md. 1988) (citations omitted).

Defendants assert that the reason for nonrenewal was Plaintiffs' failure to agree to changes or additions to the provisions of the franchise—namely, a new lease agreement with an increase

in rent and requirement to change brand and make substantial improvements.  Pursuant to PMPA § 2802(b)(3),

> the following are grounds for nonrenewal of a franchise relationship:
>
> (A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—
>
> (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and
>
> (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.

The franchisor has the burden to establish that the proposed changes to the lease agreement were made in "subjective" good faith, in the normal course of business, and not as a pretext for nonrenewal. *Strasheim v. Amoco Oil Co.*, 659 F. Supp. 687, 692 (N.D. Ill. 1987).  This can be proved with objective evidence, "such as inter-office memoranda, prior dealings between the parties, and the manner in which the changes to the franchise relationship were promulgated and presented," sufficient to constitute circumstantial proof that gives rise to an inference of either good or bad faith.  *Id.*

Defendants testified that the Proposed 2021 DLSA was offered to Plaintiffs in the normal course of business and was substantially the same as prior agreements, with some necessary changes as a result of the new underlying lease with MAA, specifically: (1) the term is 10 years rather than 3; (2) it requires Fursyth to apply for and become a 7-Eleven franchisee and pay for the necessary training, fees, and equipment purchases; (3) new rent starting at $59,800 per month with 4% annual increases; and (4) annual minimum gallons of 1,700,000.  *See* Joint Ex. 12.  Prior to the proposal, Mr. Hamzat had agreed to become a 7-Eleven franchisee, which Defendants explain

as the reason for rescinding the prior termination notice (based on loss of underlying lease) and offering the new DLSA. Defs.' Post-Hr'g Br. 17-18. Defendants' representative, Michael Harrington, testified that pro forma assumptions and station profitability were calculated in good faith, in the normal course of business, and the agreement was intended to be a "win-win for both parties." Harrington, Mar. 8 Tr. 80:7-10; 83-84. He explained that the ten-year term was typical for 7-Eleven franchises, allowing a sufficient time for a return on investment, and the rent calculation was based on incorporating a reasonable rate of return for PMG on the investment it would be making in the site improvements. *Id.* at 80:17-23; 83:9-84:25. Accordingly, Defendants contend that Plaintiffs' refusal to accept the proposed terms resulted in a proper nonrenewal.

To qualify for preliminary injunctive relief, the franchisee must rebut the franchisor's evidence that the termination or nonrenewal was permissible, by showing the existence of sufficiently serious questions as to the propriety of the termination under the PMPA to present a fair ground for litigation. *See Khorenian v. Union Oil Co.*, 761 F.2d 533, 536 (9th Cir. 1985). Plaintiffs contend that the proposed changes were not made in good faith and in the normal course of business, but rather, were a pretext to force Plaintiffs out of the franchise so Defendants could take it over themselves. Plaintiffs cite the following as evidence of bad faith and Defendants' intention to take over operation of Site 2:

- During the March 2019 meeting, Mr. Ejtemai sought to convince Mr. Hamzat to allow PMG to take over operations at Site 2. Riley, Mar. 8 Tr. 186:16-187:10; Hamzat, Mar. 9 Tr. 40:22-25. When Mr. Hamzat did not agree, Mr. Ejtemai stated that he would "do everything within their legal power" to have Mr. Hamzat removed. Hamzat, Mar. 9 Tr. 41:2-11; Riley, Mar. 8 Tr. 187:17-24. Plaintiffs argue that these actions and statements demonstrate a subjective intent to remove Plaintiffs from Site 2.

- During a meeting on August 21, 2019, Defendants' representative, Brandon Riley, presented the 2019 DLSA to Mr. Hamzat for signature, and stated that the rent increase "came from the top down," was based on the condition of Site 2 as a "pig sty," and he told Mr. Hamzat that he was "lucky" to be getting a new lease at all

because Mr. Ejtemai wanted Mr. Hamzat out.  Riley, Mar. 8 Tr. 188-191.  Mr. Hamzat testified that he asked Mr. Riley if a rent increase could be one of the options Mr. Ejtemai might use to force him out, and Mr. Riley responded, "your rent is what it is and you either sign it or you leave."  Hamzat, Mar. 9 Tr. 46:1-8.  Mr. Riley also communicated to Mr. Hamzat that PMG's upper-level management wanted to charge a higher monthly rent, but that Mr. Riley had stopped them at $59,500.  Riley, Mar. 8 Tr. 189:6-10.  Plaintiffs offer this testimony as further evidence that Defendants' subjective intent with regard to the 2021 Proposed DLSA was not in good faith.  One of these interactions with Mr. Riley was captured on video, although it was not offered into evidence.  *See* Riley, Mar. 8 Tr. 110, 189.

- Defendants initially sent a termination letter to Fursyth based on the expiration of the underlying lease under PMPA § 2802(c)(4).  Pursuant to PMPA § 2802(c)(4)(C), Fursyth requested that Defendants make a *bona fide* offer to sell Defendants' interest in its improvements and equipment, but Defendants instead rescinded the notice of termination.  Joint Exs. 9, 10.  Plaintiffs argue that the most reasonable inference for the "about face" was that it intended to take over operations at Site 2 and did not want to offer Fursyth the opportunity to buy the equipment located there.  Pls.' Post-Hr'g Br. 18.  Although Defendants assert that the offer was rescinded based on Mr. Hamzat's agreement to become a 7-Eleven franchisee, the parties' joint stipulation of facts shows that the inquiry from Defendants and confirmation of interest by Mr. Hamzat took place on January 26 and 28, 2021, which was after the letter rescinding termination dated January 6, 2021. Joint Stip. ¶¶ 30, 32-34.

- Plaintiffs contend that the economic terms of the Proposed 2021 DLSA were so one-sided that they could not possibly accept it, and Defendants' own financial projections demonstrated that Plaintiffs could not make a profit if they accepted those terms. *See* Joint Ex. 17 (showing net income for the business at the Site before payment of rent at $600,803 for the first year, resulting in a loss after the proposed rent of $717,600).  Plaintiffs suggest that the offer was a "poison pill" intended to induce Plaintiffs' refusal to accept it.  When Plaintiffs demonstrated their inability to make a profit, PMG responded that the rent was non-negotiable.  Joint Stip. ¶ 36.  Additionally, Plaintiffs note that they would be required to invest an additional $400,000 or more of their own funds into the site, which is not reflected in the pro forma.  Hamzat, Mar. 9 Tr. 61:3-5; Joint Ex. 29; *see also* Harrington, Mar. 8 Tr. 150:16- 151:3 (indicating that Fursyth would be responsible for about $880,000 investment into the site). Plaintiffs also note that Defendants provided no spreadsheets or documents supporting their calculations of the rent as a normal course of business.  Harrington, Mar. 8 Tr. 148:5-149:4, 149:16-19, 151:9-23 (stating that he followed standard company "practices and procedures" but did not describe what those procedures were and testified he was not sure if he did the calculation in his head or used a calculator but did not use a spreadsheet). There is no evidence that Defendants used a uniform rent formula or comparable terms to other franchisees. However, I note that the Defendants' arrangements with regard

to Site 1 are not comparable and do not provide evidence of bad faith based on the rent discrepancies between Site 1 and Site 2.

- Plaintiffs introduced an exhibit containing fuel pricing information from December 2021 to March 2022 that demonstrated that PMG was charging Fursyth DTW gas prices higher than the retail prices at the closest competitors. Pls.' Ex. 5; Hamzat, Mar. 9 Tr. 73:15-18; *see also* Riley, Mar. 8 Tr. 197:3-10 (confirming that PMG was setting Fursyth's DTW price 20 cents higher than the retail prices of the closest competitors). The result is that Plaintiffs are losing business, not only from lost fuel sales but also the corresponding loss of sales at the on-site store. Plaintiffs argue that this further demonstrates Defendants' subjective intent to make it impossible for Plaintiffs to remain competitive so they would choose to vacate Site 2.

- At the time that Defendants presented the Proposed 2021 DLSA to Fursyth, PMG BWI—under common ownership with PMIG 1025 and PMG—had already executed a contract with MAA to operate Site 2 as a commissioned agent. Joint Stip. ¶¶ 25-26, 34. Under the agreement, PMG would sell fuel to Apex on the "front end," and PMG BWI would receive a commission of 20 cents per gallon on the "back end." Pls.' Post-Hr'g Br. 17-18. Plaintiffs offer this as direct evidence that Defendants were insisting on the terms in the Proposed 2021 DLSA "for the purpose of converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise preventing the renewal of the franchise relationship." *Id.* at 19 (quoting 15 U.S.C. §2802(b)(3)(A)(ii)).

At this preliminary injunction stage, Plaintiffs' burden is to show only that there is a "reasonable chance" that Defendants will be unable to prove their affirmative defense that the nonrenewal was permissible under the PMPA. *Khorenian*, 761 F.2d at 535-36. They have succeeded in doing so. Plaintiffs' evidence shows the existence of several serious questions regarding the basis for the nonrenewal and whether Defendants were operating in good faith in the normal course of business or were trying to force Plaintiffs out. As noted above, this is not a heavy burden, *Moody*, 734 F.2d at 1216, and the evidence provided suggests an inference that Defendants acted in bad faith. At trial, it will be Defendants' burden to provide evidence to establish their affirmative defense that the nonrenewal was permitted by the PMPA. 15 U.S.C. § 2805(c).

"Questions of subjective intent are considered proper issues for the jury." *Tiller v. Amerada Hess Corp.*, 540 F. Supp. 160, 165 (D.C.S.C. 1981).

### III.    Balance of Hardships

"In the absence of unusual circumstances the balance of hardships imposed upon the franchisor by the issuance of a preliminary injunction will normally be less than the hardship imposed upon a franchisee if injunctive relief is not granted." *Pearman v. Texaco, Inc.*, 480 F. Supp. 767, 770 (D. C. Mo. 1979).  Here, Defendants assert that there is a real risk of penalties, (even though none have been imposed to date), based on their contractual obligations to MAA to redevelop Site 2. It is true that those penalties may be imposed by the MAA, although they have not initiated any action to do so for many months while this matter has been pending.  But Plaintiffs risk the permanent loss of the franchise and the investment of over $900,000 in the business, and Fursyth is continuing to pay rent to Defendants in accordance with the 2019 DLSA.  The 20-018 Contract between Defendants and MAA ¶ 5 allows for the possibility of extensions for delays beyond the control of Lessee.  Joint Ex. 6.  On balance, I am persuaded that the loss of the franchise outweighs the risk of penalties to Defendants if the franchise relationship is continued until the court can resolve this case on its merits.

The court has discretion in ordering Plaintiffs to post a bond prior to the issuance of the preliminary injunction. *See* 15 U.S.C. § 2805(b)(3). Here, Defendants have not made an adequate showing regarding such a bond. The preliminary injunction, therefore, is ordered without a requirement that Plaintiffs post a bond. This order is made without prejudice to Defendants seeking reconsideration as to whether or not a bond should be posted, should circumstances change prior to trial.

## ORDER

For the foregoing reasons,

1.  Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, as supplemented, ECF
    Nos. 22, 35, is GRANTED.

2.  A preliminary injunction is hereby issued to maintain the status quo of the parties
    during the pendency of the litigation, the relationships between the parties and all
    existing contracts between them shall be extended pending further Order of this
    Court, and the parties shall continue their respective obligations thereunder.

3.  No bond shall be required at this time, but Defendants may seek reconsideration
    should circumstances change prior to final resolution on the merits.

4.  A telephone conference will be promptly scheduled by separate Order for the
    purposes of concluding pretrial discovery and scheduling a trial.


Date:   May 25, 2022                                    _____/S/_____
                                                        Paul W. Grimm
                                                        United States District Judge

16